**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————
**SECURITIES AND EXCHANGE COMMISSION,**

                    Plaintiff,

        - against –

**VLADIMIR STEVEN ZUBKIS, ET AL.,**

                    Defendants.
————————————————————————

**97 Civ. 8086 (JGK)**

**OPINION & ORDER**


**JOHN G. KOELTL, District Judge:**

    The plaintiff, the Securities and Exchange Commission (the

"Commission"), seeks an order authorizing the sale of the yacht

Ligeia III (the "Yacht") and applying the net proceeds of the

sale in partial satisfaction of the Court's Final Judgment of

Permanent Injunctive and other Relief against Defendant Vladimir

Steven Zubkis ("Zubkis") and order of disgorgement in the amount

of $21,578,731.89, filed on June 29, 2001.  The Yacht has been in

the control of a Court-appointed receiver (the "Receiver") since

August 11, 2003.  International Brands, Inc. ("IBI"), which holds

legal title to the Yacht, opposes the motion and asks that the

Yacht be returned to IBI for the benefit of IBI shareholders.


1

The Court makes the following findings of fact and conclusions of law.[1]

I.

On October 31, 1997, the Commission filed its original securities fraud complaint in this action, naming, among others, Zubkis, IBI, and Z3 Capital Corporation ("Z3") as defendants.[2] (Complaint, filed Oct. 31, 1997.)  On February 23, 2000, this Court granted the Commission's motion for partial summary judgment, finding Zubkis had committed numerous violations of the federal securities laws.  SEC v. Zubkis, No. 97 Civ. 8086, 2000 WL 218393 (S.D.N.Y. Feb. 23, 2000).  The Court entered a Final Judgment against Zubkis on June 29, 2001.  (Final Judgment of Permanent and Other Injunctive Relief, dated June 29, 2001.)  The judgment enjoined Zubkis from violating federal securities laws, barred him from serving as an officer or director of a public company, and ordered him to disgorge his ill-gotten gains and prejudgment interest within thirty days of the judgment.  (Id.) The disgorgement order totaled $21,578,731.39.  (Id.)  The Court

---

[1] The parties agree that this is an application made on the evidentiary record in lieu of an evidentiary hearing, and that the evidentiary record before the Court is complete.  (See Transcript dated June 3, 2005, at 22-23.)

[2] Z3 was ultimately held in default.  Default Judgment Against Defendant Z3 for Failure to Appear and Defend, dated Jan. 21, 1999.  On April 6, 1999, this Court entered a consent judgment against IBI, enjoining IBI from future violations of the federal securities laws, but imposing no monetary relief. See Final Judgment of Permanent Injunction and Other Relief Against Stella Bella Corporation, USA, Now Known as International Brands, Inc., entered Apr. 1, 1999, modified Apr. 6, 1999.

of Appeals for the Second Circuit affirmed the judgment on May 20, 2002.  SEC v. Zubkis, 01-6151 (2d Cir. May 20, 2002).

Throughout this period of time, the Yacht in question was purchased and transferred among various corporations in which Zubkis had a controlling interest.  The Commission alleges, and IBI does not dispute, that some time prior to December 23, 1999, Zubkis purchased the Yacht from West Coast Acquisitions, LLC, d/b/a Symbolic Motor Car Company ("Symbolic"), through entities that Zubkis controlled.  The Commission alleges, and IBI does not dispute, that on December 23, 1999, the Yacht was transferred to Platinum Management Investment Corporation ("Platinum"), where Zubkis accepted the Yacht as Platinum's agent.  (See Aug. 29, 2003, Deposition of Vladislav Steven Zubkis ("Zubkis Dep.") at 92-93, 98, attached at Ex. 1 to Supplemental Declaration of John J. Graubard Pursuant to Order of April 28, 2005, dated May 10, 2005 ("Supp. Graubard Decl.").)  According to Zubkis, "nobody owned" Platinum from December 23, 1999, until March 2, 2000, although it had issued "bearer" shares of its stock.  (Id. at 98, 147.)

One week after the Court's February 23, 2000 ruling holding Zubkis liable for securities law violations and ordering further proceedings to determine the amount of disgorgement, Kona Beverage Corporation ("Kona") acquired all shares of Platinum stock.  (See id. at 98-99).  Platinum's sole asset was the Yacht,

3

and Kona's sole asset was its shares of Platinum.  (See id.)
Kona, which Zubkis described at his deposition as "an empty
company with no business," was wholly owned by Z3, which was
owned by Zubkis.[3]  (Id. at 83, 98.)

On April 17, 2001, Magistrate Judge Fox issued a report and
recommendation after an inquest on the amount of disgorgement to
be assessed against Z-3 and Zubkis.  SEC v. Zubkis, 97 Civ. 8086,
2001 WL 767590 (S.D.N.Y. Apr. 17, 2001).  The Magistrate Judge
recommended that Z-3 disgorge $7,038,901.53, including pre-
judgment interest, that Z-3 and Zubkis be held jointly and
severally liable for this amount, that Zubkis disgorge
$21,578,731.39, including pre-judgment interest, and that Zubkis
should be jointly and severally liable for that amount.  Id. at
*5.  Thus, all the assets of Z-3, particularly its Kona shares,
which controlled the Yacht, were subject to being disgorged to
the SEC.

In May 2001, Kona transferred its shares in Platinum to IBI
in exchange for 46 million shares of IBI common stock.  (Id. at
83-84, 99-100.)  Zubkis concedes that the 46 million shares of
IBI stock went to him because he owned Z3, which owned Kona.
(Id. at 83.)  Zubkis claims that, after the transaction, he owned
approximately 140 million shares of IBI stock.  (Id. at 83-84.)

---

[3] Zubkis testified at his deposition that he owned 90% of Z3 stock.  (Zubkis
Dep. At 148.) This Court has previously found that Zubkis exercised effective
control over Z3. See Zubkis, 2000 WL 218393, at *4.

4

Although it is unclear precisely what percentage of IBI's stock Zubkis owned, he claimed to be IBI's single largest shareholder at the time, and IBI's headquarters were located at Zubkis's residence. (Id. at 85-86, 129). See SEC v. Zubkis, No. 97 Civ. 8086, 2003 WL 22118978, at *2 (S.D.N.Y. Sept. 11, 2003). Zubkis was also president and chief executive officer ("CEO") of IBI from August 2000 until his resignation from both positions on July 16, 2003.[4] (Reply Declaration of John J. Graubard in Support of Motion for Sale of Yacht "Ligeia III" and Turnover of Proceeds, dated Jan. 31, 2005 ("Graubard Reply Decl."), Ex. 163 at 39; Zubkis Dep. at 113, 119, 143; Declaration of Elliot Borin in Support of International Brands, Inc. Opposition to Plaintiff's Motion for Sale of Yacht "Ligeia III" and Turnover of Proceeds, sworn to Jan. 13, 2005 ("Borin Decl.") ¶19, attached at Ex. F. to Defendant International Brands, Inc. Memorandum of Law in Support of Its Opposition to Plaintiff's Motion for Sale of Yacht "Ligeia III" and Turnover of Proceeds ("Opp. Mem.").) IBI claims that Zubkis remained a consultant to IBI until the end of 2003, but has not been affiliated with IBI since the end of 2003. (Borin Decl. ¶ 37.)

---

[4] Although IBI argues that Zubkis's tenure as CEO and President had various gaps from August 2000 until July 16, 2003, IBI offers evidence of only one gap, which occurred in 1998. See Defendant International Brands, Inc. Memorandum of Law in Support of Its Opposition to Plaintiff's Motion for Sale of Yacht "Ligeia III" and Turnover of Proceeds, at 8, Ex. G.

Since July 2003, IBI has named four different people to the positions of president and CEO: John Wishon ("Wishon"), Elliot Borin ("Borin"), William Hales ("Hales"), and Mack Hilber ("Hilber"). Wishon was president and CEO from the time of Zubkis's resignation until Wishon's resignation in August 2003. (Declaration of John J. Graubard dated Dec. 22, 2004 ("Graubard Decl."), Ex. 12.) Borin was president and CEO for a brief period after Wishon, until Hales became IBI's president and CEO on August 23, 2003. (Sept. 2, 2003, Deposition of William T. Hales ("Hales Dep."), at 10-11, attached at Ex. 13 to Supp. Graubard Decl.) Hales, who was previously IBI's senior vice president of finance, testified at his deposition that he was unable to describe what kind of business IBI is engaged in, the companies that IBI owns, or IBI's revenue for the last year. (Id. at 9, 23-24.) Hales resigned on September 2, 2003, the morning that he was deposed by the SEC. (Id. at 19.) Upon Hales's resignation, Hilber became president and CEO. (Sept. 2, 2003, Deposition of Mack O. Hilber ("Hilber Dep.") at 7, attached at Ex. 10 to Supp. Graubard Decl.) At his deposition, Hilber testified that he has been associated with IBI at various times for more than four years, but that he had no knowledge respecting IBI's assets, whether IBI owned any bank accounts, or IBI's financial statements or balance sheets. (Id. at 3, 42-43.) In May 2004,

Hilber resigned as IBI's president and CEO, and Borin replaced him. (Borin Decl., ¶¶ 17-18.)

The Commission alleges, and IBI does not dispute, that the Yacht is IBI's only asset. IBI does not have an active bank account in its name. (Zubkis Dep. at 115; Borin Decl., ¶ 36; Jan. 21, 2004, Deposition of Barbara Rustad ("Rustad Dep."), at 7, attached at Ex. 7 to Graubard Decl.) In order to allow IBI to receive and disburse investor funds, Zubkis opened escrow accounts at Laurel Hill Escrow Services, Inc. ("Laurel Hill"), an escrow agent. (Zubkis Dep. at 114-15.)

On August 11, 2003, the Court granted a Temporary Restraining Order ("TRO") freezing the Yacht and escrow accounts held by IBI and placing the Yacht in the control of the Receiver. (See Order to Show Cause for Civil Contempt, with Ex Parte Asset Freeze, Asset Seizure, Appointment of Receiver, Turnover Order, and Order for Expedited Discovery, dated Aug. 11, 2003 ("8/11/03 TRO"), attached at Ex. 5 to Graubard Decl.) After a hearing on August 26, 2003, the TRO was extended until September 10, 2003. On September 11, 2003, the Court held Zubkis in contempt for non-payment of his judgment. See Zubkis, 2003 WL 22118978, at *4. The Court ordered Zubkis to turn over to the Receiver all of his stock in IBI. Id. The Court determined that enforcement of the disgorgement order required that the Yacht and escrow accounts held by IBI remain frozen, and that the Yacht remain in control

of the Receiver. Id. at *6. The Court held in abeyance the Commission's request for liquidation of the Yacht pending further discovery regarding the Yacht's ownership. Id. at *7.

The Commission alleges that, after the Court issued the TRO freezing IBI's escrow accounts, Zubkis opened up additional escrow accounts through which he continued to control IBI's income. At her deposition, Laurel Hill's president, Maxine Beye ("Beye"), testified that two days after the TRO was entered, Zubkis opened a new Laurel Hill escrow account through Tatiana Stroock. (Feb. 24, 2004, Deposition of Maxine Beye ("Beye Dep."), at 62-63, attached at Ex. 27 to Graubard Decl.) Zubkis informed Beye that Stroock had "taken over all of [Zubkis's] interest in any and all corporations." (Id.) Beye testified that Laurel Hill then transferred the balance in a frozen IBI Laurel Hill escrow account into the new account that Stroock opened. (Id. at 75-76.) The General Escrow Instructions for the new account lists "INTERNATIONAL BRANDS, INC. and/or ROCK SOLID MINI STORAGE" as the depositor and states that "[Laurel Hill] will be instructed to transfer funds to other escrows from time to time to purchase real or personal property to be used in the operation of the businesses: INTERNATIONAL BRANDS and/or ROCK SOLID MINI STORAGE." (Graubard Decl., Ex. 28.) Stroock then opened two additional Laurel Hill escrow accounts, one which listed as depositors Rock Solid Mini Storage ("Rock Solid") and Madrid Las

Vegas Hotel and Casino Holding L.P. ("Madrid Las Vegas"), and another that was associated with Madrid Las Vegas. (Graubard Decl., Exs. 29, 30.) Both Rock Solid and Madrid Las Vegas appear to be projects for which IBI solicits investments.[5] Laurel Hill has produced checks that were deposited into the three Laurel Hill escrows from August 12, 2003 through January 23, 2004 from IBI investors, some of which carry descriptions stating that they are for "Int'l Brands, Inc.," "Investment," "12,500 shares," "Rock Solid Mini Storage," and "Madrid Las Vegas Hotel." (Graubard Decl., Ex. 31.) From August 12, 2003 through January 23, 2004, the investor funds deposited at Laurel Hill totalled $1,319,305.19. (Graubard Decl., Ex. 34.)

The disbursement of funds from these escrow accounts was authorized by letters that Zubkis would draft, Stroock would sign, and Zubkis would then fax to Laurel Hill. (Feb. 25, 2004, Deposition of Tatiana Stroock ("Stroock Dep.") at 61-63; Graubard Decl., Ex. 35.) The Commission alleges that Zubkis, through Stroock, instructed Laurel Hill to issue checks for almost the

---

[5] IBI's "Fact Sheet" describes its involvement with Rock Solid, and its partnership with San Diego Properties, which is involved in Madrid Las Vegas. See Graubard Decl., Exs. 23, 24. San Diego Properties LP is a California limited partnership of which Zubkis is the sole general partner. (Graubard Decl., Ex. 18.) Hales, a former president and CEO of IBI, testified at his deposition that IBI was involved in a project called "Rock Solid Mini Storage," and that Hales's involvement had included finding investors for Rock Solid. (Hales Dep. at 24-25.) Richard Gavzie, who IBI identified to the SEC as possessing knowledge of IBI's operations, testified at his deposition that he solicits individuals to purchase stock in Madrid Las Vegas on behalf of IBI. (Jan. 21, 2004 Deposition of Richard Gavzie ("Gavzie Dep.") at 15-16, 38, attached at Ex. 21 to Graubard Decl.)

entire amount of the deposited funds, and that Zubkis used at least $85,068.61 of these funds to pay personal expenses such as rent, utility bills, automobile payments, and private jet expenses. (Graubard Decl., Exs. 36, 37, and 38; Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Sale of Yacht "Ligeia III" and Turnover of Proceeds, dated Dec. 22, 2004 ("Pl. Mem."), at 15.) Stroock testified at her deposition that, at the request of Zubkis or IBI employees, Stroock further disbursed IBI funds from Laurel Hill into bank accounts that Stroock opened in the name of Rock Solid and herself. (Stroock Dep. at 27-28, 51-52, 80.) The Commission alleges that Stroock made checks from these bank accounts totalling at least $77,376 to pay Zubkis's personal expenses. (Pl. Mem. at 15.) IBI does not deny these allegations, but states that, since Zubkis was no longer an officer or director of IBI, "whatever investor funds he allegedly received and disbursed were with entities separate and apart from IBI." (Opp. Mem. at 18; Borin Decl. ¶ 35)


II.

Because the Court has subject matter jurisdiction over the Commission's claims against Zubkis, it has the authority to grant any equitable remedy that would enable the Commission to obtain complete relief. See SEC v. Materia, 745 F.2d 197, 200-01 (2d Cir. 1984); see also SEC v. Martino, 255 F.Supp.2d 268, 288

(S.D.N.Y. 2003), <u>remanded on other grounds</u>, 94 Fed. Appx. 871 (2d

Cir. 2004).  In the exercise of its equity powers, the Court may

order the disgorgement of profits acquired through securities

fraud, as it did in this case.  <u>See</u> <u>SEC v. Patel</u>, 61 F.3d 137,

139 (2d Cir. 1995).  The Court also has broad equitable power to

ensure the enforcement of the disgorgement order issued in this

case.  "Once the equity jurisdiction of the district court has

been properly invoked by a showing of a securities law violation,

the court possesses the necessary power to fashion an appropriate

remedy."  <u>SEC v. Manor Nursing Ctrs., Inc.</u>, 458 F.2d 1082, 1103

(2d Cir. 1972); <u>see also</u> <u>Zubkis</u>, 2003 WL 22118978, at *11.

Moreover, Section 21(d)(5) of the Securities Exchange Act of 1934

provides: "In any action or proceeding brought or instituted by

the Commission under any provision of the securities laws, the

Commission may seek, and any Federal court may grant, any

equitable relief that may be appropriate or necessary for the

benefit of investors."  15 U.S.C. § 78u(d)(5).

    The Court may use this broad equitable power to order the

turnover of assets nominally held by third parties where the

third party lacks a legitimate claim to the assets.  <u>See</u> <u>SEC v.</u>

<u>Cavanagh</u>, 155 F.3d 129, 136-37 (2d Cir. 1998) (finding, where

defendant in securities fraud action gave shares as gift to his

business associate, who then had shares transferred to his wife,

neither business associate nor wife had legitimate claim to

11

shares and thus district court did not abuse its discretion in freezing, for possible disgorgement, proceeds from sale of stock); Martino, 255 F.Supp.2d 268, 279-81, 288-89 (S.D.N.Y. 2003) (ordering turnover and liquidation of yacht nominally held by Bahamas corporation owned by defendant's husband because "the equitable powers inherent in Federal courts certainly extends to a person who, although not accused of wrongdoing, received ill-gotten funds and does not have a legitimate claim to those funds") (citation and internal quotation marks omitted).

This is particularly true in situations where the third party is a corporation that is merely the alter-ego of the defendant. The Second Circuit Court of Appeals has found that courts should refuse to give effect to the corporate form where it is introduced to defeat legislative policies. See Lowen v. Tower Asset Management, Inc., 829 F.2d 1209, 1220 (2d Cir. 1987). Specifically, "[p]arties may not use shell-game-like maneuvers to shift fiduciary obligations to one legal entity while channeling profits from self-dealing to a separate legal entity under their control." Id. Federal courts have generally considered the following factors in deciding whether to disregard the corporate form and pierce the corporate veil for various purposes in connection with federal programs: 1) the intermixing of assets among corporations and among corporations and individual defendants; 2) the failure to observe corporate formalities; 3)

12

the simultaneous sharing of employees and office space by corporate and individual defendants; 4) the inadequacy of capitalization of the corporation for its purported business purposes; 5) the defendant's domination or control over the corporation; 6) the non-payment of dividends; 7) the siphoning of corporate funds to the dominant stockholder; 8) the lack of functioning officers or directors; 9) the absence of corporate records; and 10) the fact that the corporation is merely a façade for the operation of the dominant shareholder or stockholders. See id. at 1221; Solomon v. R.E.K. Dress, 670 F.Supp. 96, 100 (S.D.N.Y. 1987)

## III.

The SEC argues persuasively that IBI is an alter ego for Zubkis, and therefore the Court should not give effect to its corporate form where doing so would frustrate the Commission's enforcement of securities law. The SEC argues that the Court should order the sale of the Yacht and turnover of the proceeds to satisfy the judgment against Zubkis because it is clear that Zubkis continues to control the Yacht through his control of IBI, and that Zubkis transferred the Yacht to IBI in order to avoid the Court's disgorgement order.

The circumstances surrounding the transfer of the Yacht establish that Zubkis transferred the Yacht to IBI solely to

avoid the disgorgement order issued by this Court.  Zubkis has

admitted that, prior to the Yacht's transfer to IBI, the Yacht

was effectively owned by Zubkis, since it was owned by Kona, a

wholly-owned subsidiary of Z3, which was owned by Zubkis.

(Zubkis Dep. at 83.)  Within two weeks after the Magistrate Judge

issued a report and recommendation that the Court order Zubkis

and Z-3 to disgorge profits, Zubkis, through Kona, transferred

the Yacht to IBI in exchange for 46 million shares of IBI, which

Zubkis concedes went directly to him. (Zubkis Dep. at 83-84, 99-

100.)

Furthermore, there was no meaningful consideration to

support the transfer of the Yacht to IBI.  The Second Circuit

Court of Appeals has held that a third party that has received

ill-gotten assets without consideration has no legitimate claim

to those assets.  See Cavanagh, 155 F.3d at 136-37 (finding that

neither relief defendant had legitimate claim to proceeds of sale

of shares because SEC was likely to be able to show that relief

defendants gave no consideration for shares and thus received

them as gift); Martino, 255 F.Supp.2d at 288-89.  Here, in return

for the Yacht, Zubkis received stock in a corporation without

assets of which he was the president and CEO.  The Yacht was and

remains IBI's sole asset.  IBI has had no operations other than

the raising of investments for projects that have never become

14

operational.[6]  IBI cannot rely on such a transfer as the basis

for a legitimate claim to the Yacht.  See Cavanagh, 155 F.3d at

136-37; Martino, 255 F.Supp.2d at 288-89.

Moreover, it is clear that Zubkis has maintained control of

IBI operations and assets since May 2001, when Zubkis transferred

the Yacht to IBI.  Zubkis was the controlling shareholder of IBI

until the Court's Order of September 10, 2003, and its president

and CEO until July 2003.  During this time, it appears that IBI

had no assets other than the Yacht and engaged in no operations

aside from raising funds from investors at Zubkis's direction.

(Zubkis Dep. at 121-24, 143; Jan. 12, 2004, Deposition of Julia

Chikin ("Chikin Dep."), at 43, attached at Ex. 17 to Graubard

Decl.; Jan. 21, 2004 Deposition of Richard Gavzie ("Gavzie Dep.")

at 15-18, 38, attached at Ex. 21 to Graubard Decl.; Hales Dep. at

9, 24; Hilber Dep. at 22-23, 41-43.)

IBI does not dispute that Zubkis dominated and controlled

IBI until late 2003, but argues that Zubkis's involvement with

IBI ended in 2003 because he resigned from the positions of

president and CEO in July 2003, turned over his shares of IBI to

the SEC in September 2003, and ceased providing any consulting

services to IBI after December 2003. IBI argues that, because its

assets are frozen, it has been unable to engage in any operations

---

[6] Although IBI disputes this, it has shown no evidence of any projects that
became operational since IBI obtained the Yacht.  In his affidavit, Borin
refers to a project that was "on the verge" of beginning in 2003, and resulted
in no sales or income for IBI.  (Borin Decl., ¶¶ 4-16.)

since the Court's August 11, 2003 TRO, and therefore there is nothing for Zubkis to control. Because Zubkis no longer has any involvement with IBI, IBI argues, he has no legal interest in the Yacht.

There is significant evidence, however, to support the Commission's claim that IBI has continued to engage in fundraising since August 2003, and that Zubkis continues to dominate and control these activities. As described above, Zubkis has continued to control the solicitation of investments on behalf of IBI projects, using escrow accounts and bank accounts, under the names of IBI projects and Stroock, an IBI employee, to channel these funds and distribute them to himself and IBI employees. IBI's contention that this activity is unrelated to IBI is not credible.[7] IBI's Exhibit A to its Opposition Memorandum ("Exhibit A") lists individual IBI shareholders, the dates of their IBI stock purchases, and the number of IBI shares purchased on each date. (Opp. Mem., Ex. A.) Exhibit A shows that many of these purchases were made after August 2003, when IBI claims it ceased all activity. (Graubard Reply Decl., Ex. 148.) Moreover, many of these checks from investors that are dated after August 2003 correspond in date and number of shares purchased to stock issuance dates and shares

---

[7] For example, IBI has failed to explain why, if it no longer engages in any activities, it continues to employ a bookkeeper. (Opp. Mem. at 5; Deposition of Barbara Rustad, sworn to Jan. 21, 2004, at 17-20, attached at Opp. Mem., Ex. C.)

16

listed on Exhibit A. (Grabaud Decl., ¶ 4, Ex. 148.) This evidence demonstrates that, contrary to IBI's allegations, after August 2003 Zubkis continued to orchestrate the solicitation of funds on behalf of IBI and to control the distribution of these funds.

IBI also continues to represent to the public that Zubkis controls its activities. IBI does not dispute that its current website states that IBI "is headed by well-known entrepreneur Steven Vladislav Zubkis, who serves as CEO and president." (Graubard Decl., Ex. 11; Graubard Rep.Decl., Ex. 159.) Although IBI argues that it does not have the funds to correct the website, it appears that the website was changed at least by January 25, 2005 to list both Elliott Borin and Zubkis as IBI's "President and CEO." (Borin Decl., ¶ 32; Graubard Rep. Decl., ¶ 5, Exs. 155-59.) The website also continues to list Zubkis as the administrative contact for the IBI website. (Graubard Rep. Decl., ¶ 6, Ex. 160.)

Furthermore, there is little evidence that Zubkis's four successors acted as more than figureheads for IBI. As described above, the two successors that the Commission was able to depose, Hales and Hilber, had no knowledge of IBI's activities or finances other than that it solicits investments. (Hales Dep. at 9, 23-24; Hilber Dep. at 3, 42-43.) The current CEO and president, Borin, suggests in his affidavit that he has been

unable to conduct activities on behalf of IBI as president and CEO because IBI currently has no funds or activities and was unable to conduct fundraising activities for the entire year of 2004 and the majority of 2003. (Borin Decl., ¶ 36-38.) However, as described above, there is evidence that Zubkis has controlled the solitication and dispersal of funds through IBI since his resignation as CEO and president in July 2003.

IBI argues that the sale of the Yacht and the turnover of the proceeds to satisfy the judgment against Zubkis would greatly prejudice IBI's shareholders, particularly since the Yacht is IBI's sole asset. As described above, however, the Yacht is an asset that in equity does not belong to IBI because it was transferred to IBI by Zubkis without meaningful consideration in order to avoid the Court's order of disgorgement. <u>See</u>, <u>e.g.</u>, <u>Cavanagh</u>, 155 F.3d at 136-37; <u>Martino</u>, 255 F.Supp.2d at 288-89. The IBI shareholders therefore have no right to the Yacht or to the proceeds of its sale. <u>See</u> <u>Cavanagh</u>, 155 F.3d at 136-37 (finding no legitimate claim where proceeds of wrongdoing were given to relief defendant without consideration); <u>Martino</u>, 255 F.Supp.2d at 288-89. The shareholders of IBI cannot be prejudiced by the transfer of an asset to which they have no legitimate claim. <u>See</u> <u>Cavanagh</u>, 155 F.3d at 136; <u>Martino</u>, 255 F.Supp.2d at 288-89.

## CONCLUSION

For the reasons explained above, the Commission's motion for sale of the Yacht and turnover of the proceeds is granted. The Yacht should be sold and the proceeds of such sale are to be used to satisfy the disgorgement award against Defendant Zubkis. IBI's cross motion for the return of the Yacht is denied.

**SO ORDERED.**

**Dated:**    **New York, New York**
           **June 30, 2005**

John G. Koeltl
United States District Judge